ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
JAN 2 8 2004
U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **EXELON GENERATION COMPANY, LLC** and **AMERGEN ENERGY COMPANY, LLC** Plaintiffs, v. **UNITED STATES OF AMERICA,** Defendant. | No. 04-0104C<br>Judge ____________ |

## COMPLAINT

Plaintiffs, Exelon Generation Company, LLC ("Exelon Generation") and AmerGen Energy Company, LLC ("AmerGen"), through undersigned counsel, for their Complaint in this action, allege as follows:

## NATURE OF THE CASE

1. This is an action for breach of contract. Pursuant to the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101 *et seq*. ("NWPA"), the Department of Energy ("DOE") entered into written contracts, known as the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contract") with the former owners and operators of Oyster Creek Nuclear Generating Station ("Oyster Creek") and Three Mile Island Nuclear Power Station, Unit One ("TMI-1") in 1983, and Clinton Power Station ("Clinton") in 1984. Pursuant to the terms of the Standard Contracts, the Government was to accept and dispose of spent

nuclear fuel and high-level radioactive waste (collectively, "SNF") generated by the three commercial nuclear power plants beginning January 31, 1998, in exchange for agreed payments fixed in the Standard Contract at particular amounts. Each of those Standard Contracts has been assigned to, and is now held by, the purchaser of those three plants, AmerGen. Plaintiffs and the former owners and operators of Oyster Creek, TMI-1, and Clinton have honored all of their contractual obligations that have become due under the Standard Contracts. The Government breached the Standard Contracts by failing to remove and dispose SNF by the contract deadline. In fact, the Government has declared that it will not begin to attempt to comply with its obligations until 2010 at the earliest, twelve years after the deadline specified in the Standard Contract.

## JURISDICTION

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491(a)(1).

## PARTIES

3. AmerGen is the current owner and operator of TMI-1 (located in Londonderry Township, Pennsylvania), Oyster Creek (located in Lacey Township, New Jersey), and Clinton (located in Harp Township, Illinois). AmerGen was formed in 1997 as a joint venture by PECO Energy ("PECO") of Philadelphia, Pennsylvania and British Energy plc ("BE") of Edinburgh, Scotland.

4. Exelon Generation Company, LLC is now the sole owner and the ultimate parent company of AmerGen. Exelon Generation purchased BE's share of AmerGen on or about December 22, 2003.

5. GPU Nuclear, Inc. ("GPUN") operated TMI-1 on behalf of its owners, Jersey Central Power & Light Company ("JCP&L"), Metropolitan Edison Company, and Pennsylvania Electric Company from original licensing until December 20, 1999 when TMI-1 was purchased by AmerGen from GPUN and affiliated entities. GPUN entered into a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste with DOE for TMI-1 pursuant to which DOE was to accept and dispose of the SNF generated by the nuclear plant in return for payment of specified fees by GPUN. On January 7, 2000, GPUN notified DOE of the assignment of the Standard Contract to AmerGen pursuant to Article XIV of the Standard Contract.

6. GPUN operated Oyster Creek on behalf of its owner, JCP&L, from original licensing until August 8, 2000 when Oyster Creek was purchased by AmerGen from GPUN and affiliated entities. GPUN entered into a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste with DOE for Oyster Creek pursuant to which DOE was to accept and dispose of the SNF generated by the nuclear plant in return for payment of specified fees by GPUN. On August 9, 2000, GPUN notified DOE of the assignment of the Standard Contract to AmerGen pursuant to Article XIV of the Standard Contract.

7. Illinois Power operated Clinton from original licensing until December 15, 1999, when Clinton was purchased by AmerGen from Illinois Power. Illinois Power entered into a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste with DOE for Clinton pursuant to which DOE was to accept and dispose of the SNF generated by the nuclear plant in return for payment of specified fees by Illinois Power. On February 22, 2000, the DOE was notified of the

assignment of the Standard Contract to AmerGen pursuant to Article XIV of the Standard Contract.

8. Defendant is the United States of America, acting through DOE.

9. DOE is a cabinet-level department in the Executive Branch authorized to make contracts to accept and dispose of SNF generated by utilities, including AmerGen and Exelon Generation.

## FACTUAL ALLEGATIONS

### Nature of the Government's Obligations Under the Standard Contracts

10. SNF is composed in significant part of uranium and byproducts of nuclear fission such as plutonium and other highly radioactive substances. SNF remains radioactive after it is removed from a nuclear reactor and must be isolated in safe disposal facilities for an indefinite period.

11. It has been the policy of Congress for many years, and remains so today, that the obligation to protect future generations from the hazards of SNF is better discharged by final disposal in Government-owned and controlled sites than by storage in utility-controlled sites such as power generating facilities.

12. In 1982, Congress enacted the NWPA, codifying the Federal Government's long-standing commitment to accept responsibility and provide for the timely disposition of commercial SNF. *See* 42 U.S.C. § 10101 *et seq.* Pursuant to Section 302(a)(5)(b) of the NWPA, the DOE was required to enter into contracts requiring it to begin accepting and disposing of commercially generated SNF no later

than January 31, 1998, in return for the payment of fees by utilities that generated or held title to SNF.

13. Pursuant to Section 302 of the NWPA (42 U.S.C. § 10222), the Government developed the Standard Contract. The Standard Contract prescribes the payment of fees into the Nuclear Waste Fund and the acceptance and disposition of SNF by the Government. *See* 10 C.F.R. § 961.11.

14. The Standard Contract provides that the Government shall begin to accept and dispose of SNF no later than January 31, 1998, and shall continue "until such time as all SNF and/or HLW [high level radioactive waste] from the civilian nuclear power reactors . . . has been disposed of." (Standard Contract, Art. II).

**Specific Terms of the Standard Contracts With the Government**

15. DOE entered into the Standard Contracts at issue here with the owners and operators of Oyster Creek and TMI-1 in 1983, and Clinton in 1984. Each of those Standard Contracts has been assigned to, and is now held by, AmerGen. Plaintiffs, and the prior owners and operators of Oyster Creek, TMI-1, and Clinton, have fully complied with their fee payment obligations under the contracts.

16. AmerGen's Standard Contracts obligated the Government to commence acceptance of AmerGen's SNF by January 31, 1998. (Standard Contract Art. II, Art. IV.B.5(a), and Art. VI.B.1(b)).

17. The Government deposited the fees it received from utilities, including AmerGen, into the Nuclear Waste Fund, which was to be the source of funds to cover the Government's costs for disposing of SNF. (42 U.S.C. §§ 10131(b)(4), 10222).

18. Congress established the Nuclear Waste Fund as a separate interest-accruing fund in the Treasury of the United States, to receive the fees paid to the Government by utilities pursuant to the Standard Contract.

19. According to the Office of Management and Budget, the balance in the Nuclear Waste Fund at the end of fiscal year 2002 (September 30, 2002) was $13.1 billion. The Government expects the Fund to accrue about $400 million in interest annually, and to receive contract payments from utilities amounting to approximately $700 million per year. The Government estimates that the balance in the Fund was $14.6 billion at the end of fiscal year 2003.

**The Government's Breaches of Its Obligations**

20. During the late 1980s and early 1990s, many states and utilities became concerned about the Government's ability to meet its obligations to utilities and third parties under the Standard Contracts and otherwise.

21. In response to utility inquiries, on April 28, 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues, 60 *Fed. Reg.* 21793-02 (1995) ("Final Interpretation") asserting that DOE did not have a statutory or contractual obligation to accept SNF beginning January 31, 1998, in the absence of a repository or interim storage facility constructed under the NWPA.

22. Certain states and utilities petitioned for review of DOE's Final Interpretation in the United States Court of Appeals for the District of Columbia Circuit, pursuant to the NWPA (42 U.S.C. § 10139(a)(1)).

23. On July 23, 1996, in *Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996), the United States Court of Appeals for the

District of Columbia Circuit held that the NWPA imposed on the Government an obligation to begin disposing of SNF by January 31, 1998, conditioned only on fulfillment by utilities of their obligation to pay fees into the Nuclear Waste Fund, and remanded the matter to the Government for proceedings consistent with the opinion.

24. In December 1996, the Government, acting through DOE, announced that it would not begin to dispose of SNF by the statutory deadline, and suggested that its delay was "unavoidable" and thus excusable under Article IX of the Standard Contract.

25. On January 31, 1997, Northern States Power Company and other utilities filed a petition in the District of Columbia Circuit for a writ of mandamus to compel the Government to comply with the mandate in *Indiana Michigan* and to honor the Government's unconditional obligations under the NWPA and Standard Contract.

26. On June 3, 1997, while the mandamus proceeding was pending, the Government issued a document titled "Contracting Officer's Preliminary Determination that the Department of Energy's Delay in Beginning Spent Fuel Disposal Was Unavoidable." This document described the Government's difficulties in preparing a permanent deep geologic disposal site in which to store SNF, and asserted that the Government's failure to construct a deep geologic disposal site excused it from any obligation to utility Standard Contract parties because the delay was allegedly "unavoidable."

27. In *Northern States Power Co. v. United States*, 128 F.3d 754 (D.C. Cir. 1997), the District of Columbia Circuit on November 14, 1997 rejected the Government's assertions in the June 3 Preliminary Determination, and reaffirmed its

ruling in *Indiana Michigan* that the NWPA required the Government to undertake, through the Standard Contract, acceptance and disposal of utilities' SNF by January 31, 1998. The Court of Appeals held that "[t]he contractual obligations created consistently with the statutory contemplation leave no room for [the Government] to argue that it does not have a clear duty to take the SNF from the owners and generators by the deadline imposed by Congress." *Id.* at 758-59. The Court issued a writ of mandamus " to correct [the Government's] misapprehension of [*Indiana Michigan*]," stating that "we preclude [the Government] from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." *Id.* at 760.

28. The ruling of the District of Columbia Circuit in *Northern States Power* precludes the Government from arguing here that its breach of AmerGen's Standard Contracts is excused on the grounds that it was unavoidable or that the Government's performance of AmerGen's Standard Contracts was impossible or in any way excused.

29. The District of Columbia Circuit reaffirmed its November 1997 ruling in an order issued May 5,1998, stating "[o]ur decision in *Northern States* barred the DOE from interpreting the [Standard] Contract as imposing only a contingent disposal obligation." *Northern States Power Co. v. United States,* 1998 WL 276581, *1 (D.C. Cir. May 5, 1998).

30. The declaratory and mandatory relief sought by the petitioning utilities in *Northern States* was separate and apart from any and all rights of such utilities,

including Plaintiffs, to monetary damages or other relief from the Government's breach of its obligations pursuant to the Standard Contracts.

31. Despite the District of Columbia Circuit's second unequivocal ruling in *Northern States* that the Government had an unconditional obligation to commence acceptance and disposal of SNF by January 31, 1998, the Government failed to begin accepting SNF by the contractual and statutory deadline, and has publicly announced that it will not begin to dispose of SNF until 2010, at the earliest.

32. On August 31, 2000, the Federal Circuit, in a decision involving another utility that had sued for breach of the Standard Contract, concluded that DOE's failure to begin accepting spent nuclear fuel by the January 31, 1998 contractual deadline constituted a breach of the Standard Contract. *Maine Yankee*, 225 F.3d 1336 (Fed. Cir. 2000). In the companion *Northern States* case, the Federal Circuit held that the unavoidable delays provision of the contract "does not bar a suit seeking damages for the Government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998." *Northern States*, 224 F.3d at 1367. In summary, the Federal Circuit has determined as a matter of law that DOE breached the Standard Contract and that Plaintiffs and other similarly situated utilities that are parties to the Standard Contract can bring an action for breach of contract in this Court.

33. As a consequence of the Government's refusal to accept and dispose of SNF, Plaintiffs and the predecessor Standard Contract holders incurred, and Plaintiffs will incur, very substantial costs, including, but not limited to, the costs to investigate, design, license, and construct alternative storage facilities, and to store SNF

beyond the time that the Government would have removed all the SNF had the Government not breached the Standard Contract.

34. Plaintiffs' claims in this action are for damages resulting from the Government's existing breach of its obligations to dispose of Plaintiffs' SNF. Plaintiffs insist that the Government meet its obligations to dispose of Plaintiffs' SNF, and, should the Government fail to do so, Plaintiffs reserve all rights to assert new and separate breach claims at that time.

## CLAIM FOR RELIEF

### Count I: Breach of Contract: Damages

35. Paragraphs 1 through 34 are incorporated herein by reference as if set forth in full.

36. The Government's failure and refusal to begin to dispose of SNF beginning on January 31, 1998 constitutes a material partial breach of the Government's obligations under the Standard Contract. In fact, the Government has declared that it will not begin to dispose of SNF until 2010, at the earliest twelve years after the deadline specified in the Standard Contract.

37. The Standard Contracts between AmerGen and DOE contain an implied covenant of good faith and fair dealing, pursuant to which DOE has a duty to perform its obligations under the contracts in good faith and not to take actions detrimental to Plaintiffs' contractual rights. In addition to its breach of contract identified in Paragraph 36, DOE has breached the covenant of good faith and fair dealing by failing and refusing to make any effort to meet the contractual deadline for beginning to dispose of SNF; by steadfastly attempting to avoid its obligations under the contracts as defined

by the District of Columbia Circuit; by failing to make any effort to dispose of Plaintiffs' SNF or even to provide Plaintiffs with a firm date on which DOE will begin to do so; by attempting to limit its own obligations by issuing documents with a proposed acceptance rate inconsistent with the parties' expectations and based on unlawful assumptions; and by insisting on Plaintiffs' continued performance of reciprocal obligation to pay fees into the Nuclear Waste Fund despite DOE's refusal to perform.

38. DOE's failure to act has not been the result of inadequate resources. DOE annual expenditures from the Nuclear Waste Fund have consistently been well below the level of annual receipts into the Nuclear Waste Fund. There are ample funds available to DOE to comply with its contractual obligations.

39. In contrast to DOE's failure to take any action to meet its contractual commitments, DOE has taken action to receive, transport and store SNF from other entities. For example, DOE continues to accept and store SNF from foreign research reactors.

40. As a direct and proximate result of the Government's breaches of its Standard Contracts, Plaintiffs have incurred and will incur damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Exelon Generation Company, LLC and AmerGen Energy Company, LLC respectfully request that the Court enter judgment in their favor and against the United States granting Plaintiffs the following relief:

(a) damages for breach of contract; and

(b) interest and such costs, expenses, and attorney's fees as are available under applicable law, and such other relief as the Court deems just and proper.

Respectfully submitted,

By: ______________________
NORMAN M. HIRSCH
Jenner & Block LLP
One IBM Plaza
330 North Wabash
Chicago, IL 60611
(312) 923-2782 telephone
(312) 923-7782 fax
COUNSEL FOR PLAINTIFFS
EXELON GENERATION COMPANY, LLC,
AMERGEN ENERGY COMPANY, LLC

Of Counsel:

Donald R. Cassling
David Jiménez-Ekman
Christopher Tompkins
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

Brad Fagg
Paul Bessette
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-3000

Thomas S. O'Neill
Exelon Nuclear
Cornerstone II, 5th Floor
4300 Winfield Road
Warrenville, IL 60555
(630) 657-3770

January 28, 2004.